# UNITED STATES DISTRICT COURT
for the
District of New Mexico

FILED
United States District Court
Albuquerque, New Mexico

Mitchell R. Elfers
Clerk of Court

| In the Matter of the Search of | ) | |
|---|---|---|
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) ) | Case No. 22-MR-397 |
| One black Motorola cellular telephone recovered from TRUJILLO, further described in ATTACHMENT A | ) ) ) | |

**APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS**

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A (incorporated by reference).

located in the _____ District of __New Mexico__ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B (incorporated by reference).

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☑ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC § 922(a)(6): | Knowingly Making False Statements in Connection with the Purchase of a Firearm |
| 18 USC § 922(a)(1)(A): | Dealing in Firearms Without a License |

The application is based on these facts:
Please see the attached affidavit of ATF Special Agent Brenton Hutson, which is incorporated by reference.

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days *(give exact ending date if more than 30 days: _____)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Brenton Hutson, ATF Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
__telephonically sworn and electronically signed__ *(specify reliable electronic means)*.

Date: March 9, 2022

City and state: Albuquerque, New Mexico

_____
*Judge's signature*

Honorable John F. Robbenhaar, U.S. Magistrate Judge
*Printed name and title*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| In the Matter of the Search of:<br><br>One black Motorola cellular telephone recovered from TRUJILLO, further described in ATTACHMENT A | Case No. _____ |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Brenton Hutson, a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives, being duly sworn, depose and state as follows:

## INTRODUCTION

1. I am a Special Agent (SA) with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), and have been so employed since January 2020. I am a United States Marine Corps Veteran, to include one combat deployment, and am also a graduate of the University of Colorado, holding a Bachelor's Degree in Nonprofit Management and a Master's Degree in Public Administration. I previously worked in the field of human services for approximately seven years, managing programs designed to assist individuals struggling with homelessness, severe mental illness, and substance use disorders. I have also attended and graduated from the Federal Law Enforcement Training Center and the ATF National Academy.

2. I have training and experience investigating violations of Federal law, including investigations involving the forensic examination of electronic devices and cellular telephones.

3. I am familiar with the information contained in this Affidavit based upon the investigation that myself and other law enforcement officers have conducted, on my conversations with other law enforcement officers or industry operations investigators who have engaged in various aspects of this investigation and based upon my review of reports written by other law enforcement officers involved in this investigation. Because this Affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only those facts that I believe are relevant to the determination of probable cause to support the issuance of the requested warrant. When the statements of others are set forth in this Affidavit, they are set forth in substance and in part.

## PURPOSE OF AFFIDAVIT

4. I make this Affidavit in support of an application for a search warrant for authorization to search the cellular telephone (SUBJECT DEVICE) further described in ATTACHMENT A belonging to Alberta TRUJILLO for evidence of violations of:

   a. 18 USC § 922(a)(6): Knowingly Making False Statements in Connection with the Purchase of a Firearm
   b. 18 USC § 922(a)(1)(A): Dealing in Firearms Without a License

5. The SUBJECT DEVICE is further described as a black Motorola cellular telephone with a cracked screen and a Verizon logo visible on the back, recovered from TRUJILLO on March 5, 2022. I seek authorization to search the SUBJECT DEVICE for the items described in ATTACHMENT B which is incorporated throughout by reference. The SUBJECT device is in ATF's possession and has been since being seized from TRUJILLO on March 5, 2022.

6. Based on my training and experience, and that of other more experienced law enforcement officers, and the facts set forth in this Affidavit, there is probable cause to believe that the above-listed violations have been committed by TRUJILLO. There is also probable cause to search the information described in ATTACHMENT A for evidence of those crimes as described in ATTACHMENT B.

## PROBABLE CAUSE

### Report of Suspicious Activity and Initial Investigation

7. On January 24, 2022, I was contacted by W.B., an individual whose identity is known to me, and whose profession provides them occasion to observe potentially suspicious activity by individuals seeking to obtain firearms from BMC Tactical, a Federal Firearms Licensee (FFL). W.B. indicated a store employee, J.R., reported an individual identified as Alberta TRUJILLO may have been purchasing firearms for a young, male family member who apparently accompanied her to the store.

8. I began an investigation and located a report which appeared to identify TRUJILLO as the original retail purchaser of a firearm recovered in association with suspected criminal activity. While TRUJILLO's date of birth was reported slightly differently on the report as compared to her driver's license, I noted the reported driver's license number reflected in the report appeared to match TRUJILLO.

9. This report indicated TRUJILLO had purchased a firearm that was recovered from Dominic Mora on January 10, 2020, reflecting a 79-day time-to-crime, that being the time from the original retail purchase of a firearm to the time it is recovered by law enforcement. Based on my training and experience, a 79-day time-to-crime is considered very short and is potentially an indicator of criminal activity.

10. Conducting additional research into the firearms purchase history of TRUJILLO, I identified additional firearms transfers from ATF Form 4473 Firearms Transaction Records as summarized in the table below:

| **Certification Date** | **Transfer Date** | **FFL** | **Firearms Transferred to TRUJILLO** | **Indicated Actual Buyer Transferee** | **Signed Certification Statement** |
|---|---|---|---|---|---|
| 10/18/2019 | 10/27/2019 | K&J Armory | 1) Mossberg MAV 88 12 Gauge Shotgun (SN: MV0375398) | Yes | Yes |
| 12/09/2021 | 12/13/2021 | BMC Tactical | 1) Radical Firearms RF-15 Multi Caliber Rifle (SN: 21-074517) | Yes | Yes |
| 11/06/2021 | 11/06/2021 | BMC Tactical | 1) Glock 23 .40 Caliber Pistol (SN: WYA361) | Yes | Yes |
| 10/18/2021 | 10/22/2021 | BMC Tactical | 1) Palmetto State Armory Poly Multi Caliber Receiver (SN: JJE02952) | Yes | Yes |
| 09/14/2021 | 09/18/2021 | BMC Tactical | 1) Glock 22 .40 Caliber Pistol (SN: PZE720) | Yes | Yes |
| 08/17/2021 | 08/21/2021 | BMC Tactical | 1) Taurus G2C 9mm Pistol (SN: 1C052093) | Yes | Yes |

**Interview of TRUJILLO**

11. On March 5, 2022, W.B. alerted me TRUJILLO had contacted BMC Tactical and was on her way there. Myself, SA Allison Garcia, and SA Jennifer Raissi responded. I arrived on-scene first and observed TRUJILLO and three associates subsequently identified as Joseph Chavez, Isaac Chavez, and Monique Chavez approaching the entrance to the store at approximately 2:52PM. I then entered BMC Tactical, in an undercover capacity, and observed Trujillo, Joseph Chavez, Isaac Chavez, and Monique Chavez appearing to interact with each other in a manner suggesting they had arrived at the store as a group.

12. While I was surveilling the group, W.B. sent me a photograph of an ATF Form 4473 reported to have been completed by TRUJILLO in association with the day's planned transaction. This ATF Form 4473 reflected TRUJILLO was seeking to have a Glock 23 .40 Caliber Frame (SN: ABPR071) and a Charles Daly PAX-9 9mm Pistol (SN: RON2171144) transferred to her. TRUJILLO also appeared to have answered 'yes' to the question on the form inquiring if she was the actual transferee/buyer of the listed firearms and providing a warning which reads, in part, "Warning: You are not the actual transferee/buyer if you are acquiring the firearm(s) on behalf of another person. If you are not the actual transferee/buyer, the licensee cannot transfer the firearm(s) to you."

13. After surveilling the group for a period of time, myself and SA Garcia approached them as they were standing outside of the entrance to BMC Tactical. I identified myself as an ATF Special Agent and, with SA Garcia, subsequently identified the members of the group. I asked TRUJILLO if she would mind speaking with me to which she agreed.

14. SA Garcia, me, and TRUJILLO proceeded to an office located off of the main store showroom. During the initial segment of the interview, TRUJILLO stood closest to the office door which remained unlocked. TRUJILLO was not restrained or blocked from accessing the office door, and the firearms of both myself and SA Garcia were concealed. Prior to the interview commencing, I advised TRUJILLO that she was not under arrest, was not detained, and was free to go at any time. I also advised TRUJILLO of her *Miranda* rights, with TRUJILLO indicating she understood her rights and subsequently agreeing to speak with SAs.

15. TRUJILLO initially made a series of seemingly conflicting statements, the sum of which indicated to me that she was having the firearms from the day of our encounter transferred to her in order to then sell them to one of her associates, and that one of her associates had provided her with the funds to complete the firearms transfer. Her statements also appeared to indicate TRUJILLO had previously completed transfers for firearms that Mora had ordered online. At one point, TRUJILLO indicated she did not want to talk anymore and left the office where the interview took place. Based upon TRUJILLO's statements over the course of the interview, I suspected TRUJILLO had made false statements on the ATF Form 4473 associated with the transaction which led me to detain TRUJILLO in the parking lot of BMC Tactical as she was walking towards her vehicle.

16. TRUJILLO then asked, "what did I do?" As TRUJILLO's associates were no longer visible, I asked, "where are they at?" and "did they take off on you?" being concerned that the unknown location of TRUJILLO's associates could pose a potential risk to the safety of the agents present. TRUJILLO denied knowing. I asked where TRUJILLO's vehicle was in order to determine if she would be able to leave on her own after the contact was complete, or if she would require assistance. TRUJILLO motioned to a nearby sedan and said, "Right there." I stated, "Well, we're going to wait and see if we can talk to them ok. You do not…You've told me you don't want to answer any more questions so I'm assuming you've invoked your right to silence. Is that what you want to do?". TRUJILLO replied, apparently referring to Mora, "Well I told you that he ordered it and I didn't even know it til the day that he asked me to

come and get it. And I told him to get and, that I don't want that shit in my house. I've never had any guns (inaudible)." I replied, "Alberta if you want. If you want to talk to me, I am willing to talk to you, but if you are invoking your right to silence, I do not want to talk to you, so you've got to tell me what you want. What do you want?" TRUJILLO answered, "Well I don't know what do you want me to do? I told you. That's the honest truth." I reiterated, "Do you want to talk to me? If you want to talk to me, I will talk to you. If you don't, I will not, but I need you to tell me what you want. Do you want to talk to me or don't you?" TRUJILLO replied, "I don't know, I guess, whatever. But I swear to God I never did any of that. I didn't order that gun." Thereafter, I continued questioning.

17. When I explained I had a list of firearms in TRUJILLO's name, TRUJILLO denied she purchased the firearms for Mora, but affirmed Mora had ordered the firearms in TRUJILLO's name online and had a 'couple of things' delivered to BMC Tactical. TRUJILLO indicated she put the firearms away and then Mora obtained them on his own. When I asked if TRUJILLO was the actual buyer of the firearms, Mora stated, "Yes. He must have because I didn't do it. I don't even know how to do that…he ordered them himself."

18. TRUJILLO affirmed Mora had ordered the firearms online. I asked again if MORA was the actual buyer of the guns, to which TRUJILLO replied, "I guess, yeah." When asked if it was a lie when she stated she was the buyer on the form, TRUJILLO replied, "Yes, well I thought I was. Wouldn't that make me the buyer, since it's in my name?" When I reminded TRUJILLO that she had just told me Mora was the buyer, TRUJILLO replied, "Well I wanted to sell it to him, to get rid of it", apparently in reference to Joseph Chavez as opposed to Mora. I then inquired if the firearm from the date of the interview was for Joseph Chavez, TRUJILLO expressed it was not and that after she purchased it and took it home, she was going to try to sell it, but Joseph Chavez had loaned her the money to take it out and was interested in buying it. TRUJILLO continued, indicating she wanted to take it home, 'check it out', and then get rid of it.

19. TRUJILLO indicated MORA ordered 'something', not to her knowledge, and 'they got here', in apparent reference to firearms given the context of the conversation. I inquired how many times this had occurred, with TRUJILLO indicating it had happened approximately three times, and that she had come to BMC Tactical approximately three or four times. I reminded TRUJILLO she had previously told me she had only been to BMC Tactical two times and asked if that was a lie. TRUJILLO admitted it was a lie. I asked TRUJILLO why she had been lying to me, and she replied, "because I don't want to get in trouble."

20. TRUJILLO, in apparent reference to the firearms she travelled to BMC Tactical to have transferred to her on the date of the interview, and the individuals who accompanied her, stated, "They didn't order that gun. That guy did not. I think Domenic did in my name again. And then when they called me about it I said what the fuck. So I totally spaced it out, ok, I spaced out this fucking order. Cause I didn't want to come and get it. Cause I said he did it to me again. And then these guys offered to buy it from me because I maybe Domenic told Monique

about it." I asked if TRUJILLO wanted the gun from the date of the interview to which TRUJILLO replied, "No, I don't want it." I inquired if TRUJILLO would have used the gun from the date of the interview to which TRUJILLO replied, "No." I asked what TRUJILLO intended to obtain the firearm for, to which TRUJILLO replied, "To try to sell it and make some money because Domenic left me with the bill." TRUJILLO explained this bill was in reference to a vehicle TRUJILLO had taken out a loan to help Mora buy, with Mora helping her to pay the loan.

21. I explained my understanding of the situation on the date of the interview to TRUJILLO based upon her prior statements. In summary, I indicated I understood someone had ordered the firearm online (TRUJILLO expressed her belief it was Mora who had done so, in her name) and had it delivered to BMC Tactical. At some point, Monique Chavez reminded TRUJILLO the firearm was at BMC Tactical, and Joseph Chavez loaned TRUJILLO the money for the firearm. TRUJILLO appeared to affirm this was correct, and stated, "yes, he offered to buy it from me." TRUJILLO clarified that the firearm Joseph Chavez was going to buy from her was, "the one that's put together." TRUJILLO affirmed the Charles Daly PAX9 9mm was the one she was going to sell to Joseph Chavez. TRUJILLO subsequently clarified the financial arrangement, indicating Joseph Chavez was going to give her the money to take the firearm out (previously stated to have been $40 to cover the $35 transfer fee) and then give TRUJILLO an additional $100.

22. At one point, TRUJILLO indicated Monique Chavez text messaged her regarding an order (understood to refer to the order of firearms TRUJILLO had traveled to BMC Tactical to have transferred). I asked if TRUJILLO she could show me the referenced text messages on her phone, which TRUJILLO consented to. I observed the screen while TRUJILLO held the phone, and SA Garcia photographed it. I noted the screen of the device was severely cracked, partially obscuring some words or phrases. The exchange, purportedly between Monique Chavez and TRUJILLO, appeared to read as follows:

    a. Individual believed to be Monique Chavez.: Ya no u don't my dad said he'd give u $100 if u pull it out
    b. TRUJILLO: Okay let me see if they still have it? I'll let you know after I found out! Ok
    c. Individual believed to be Monique Chavez.: Ok I'm going to get some beans now too I'll throw u some for getting it k
    d. TRUJILLO: Hey they said it's a Glock and another box right? It's gonna be 7500 dollars to boxes out

23. I inquired about specific firearms transfers. During this line of questioning, TRUJILLO admitted to lying on the associated ATF Form 4473 records in association with the firearms transfers listed below:

    a. K&J Armory – Transfer Date October 27, 2019

       i. Mossberg MAV 88 12 Gauge Shotgun (SN: MV0375398)
   b. BMC Tactical – Transfer Date December 13, 2021
       i. Radical Firearms RF-15 Multi Caliber Rifle (SN: 21-074517)
   c. BMC Tactical – Transfer Date November 6, 2021
       i. Glock 23 .40 Caliber Pistol (SN: WYA361)
   d. BMC Tactical – Transfer Date October 22, 2021
       i. Palmetto State Armory Poly Multi Caliber Receiver (SN: JJE02952)
   e. BMC Tactical – Transfer Date September 18, 2021
       i. Glock 22 .40 Caliber Pistol (SN: PZE720)

### Seizure of Cellular Telephone

24. At one point during the interview, after Trujillo had voluntarily shown me the text messages above, I requested TRUJILLO's consent to take possession of her phone and extract data from it. TRUJILLO did not clearly give consent; thus, I did not retain possession of TRUJILLO's phone with her consent.

25. Knowing that information stored on cellular telephones is easily destroyed or concealed, having observed evidence of potential criminal activity having been committed by TRUJILLO and a purported co-conspirator contained in her cellular telephone, and believing that the evidence contained on TRUJILLO's cellular telephone would likely be destroyed or concealed before SAs could seize her cellular telephone through alternate means, I seized TRUJILLO's cellular telephone from her hand to retain as evidence.

### EVIDENCE COMMONLY FOUND ON CELL PHONES AND COMPUTERS

### Evidence of Criminal Activity Frequently Found on Phones

26. Based upon my training and experience, and that of other more experienced law enforcement officers, I know that individuals engaged in criminal conduct in collaboration with other offenders, such as the straw purchase of a firearm, use cellular telephones as a tool or instrumentality in committing their criminal activity. Frequently, cellular phones, such as the SUBJECT DEVICE, are used to maintain contact with their co-conspirators. Individuals engaged in criminal activity prefer cellular telephones because, first, they can be purchased without the location and personal information that land lines require. Second, they can be easily carried to permit the user maximum flexibility in meeting associates, avoiding police surveillance, and traveling to obtain or distribute firearms. The cellular telephones are used to call, text, or otherwise communicate with the actual recipients of firearms. As a result, evidence of straw purchasing could be found in text messages, call logs, photographs, videos, and other stored data on the cellular phone.

27. During the interview of TRUJILLO, she showed me a text message conversation on her phone which appeared to depict an arrangement for her to receive compensation for completing a firearms transfer as detailed in this affidavit. Based on my training and experience, and that of other more experienced law enforcement officers, the data maintained in a cellular telephone used by an individual engaged in criminal conduct is evidence of a crime or crimes. This includes the following:

a. The assigned number to the cellular telephone (known as the mobile directory number or MDN), and the identifying telephone serial number (Electronic Serial Number, or ESN), (Mobile Identification Number, or MIN), (International Mobile Subscriber Identity, or IMSI), or (International Mobile Equipment Identity, or IMEI) are important evidence because they reveal the service provider, allow us to obtain subscriber information, and uniquely identify the telephone. This information can be used to obtain toll records, to identify contacts by this telephone with other cellular telephones used by co-conspirators, to identify other telephones used by the same subscriber or purchased as part of a package.

b. The stored list of recent received, missed, and sent calls, whether through traditional cellular service or through social media or other communication applications, is important evidence. It identifies telephones or application users recently in contact with the telephone user. This is valuable information in a criminal investigation because it will identify telephones used by other conspirators, and it confirms the date and time of contacts. If the user is under surveillance, it identifies what number he called during or around the time of a straw purchase transaction or surveilled meeting. Even if a contact involves a telephone user not part of the conspiracy, the information is helpful (and thus is evidence) because it leads to friends and associates of the user who can identify the user, help locate the user, and provide information about the user. Identifying a defendant's law-abiding friends is often just as useful as identifying his criminal associates.

c. Stored text messages, whether through traditional cellular service or through social media or other communication applications, are important evidence, similar to stored numbers. Agents can identify both criminal associates, and friends of the user who likely have helpful information about the user, his location, and his activities.

d. Photographs on a cellular telephone are evidence because they help identify the user, either through his or her own picture, or through pictures of friends, family, and associates that can identify the user. Pictures also identify associates likely to be members of the criminal conspiracy. Based upon my training and experience, and that of other more experienced law enforcement officers, I know it is common for those engaged in criminal activity to photograph groups of associates, sometimes posing with weapons. These photos are often taken, stored, or sent electronically using traditional text messaging, social media, other communication applications, uploaded to cloud storage services, or publicly shared or posted on social media. Also, digital photos often have embedded "geocode" or GPS information embedded in them. Geocode information is typically the longitude and latitude where the photo was taken. Showing where the photo was taken can have evidentiary value. This location information is helpful because, for example, it can show where coconspirators meet, where they travel, and where assets might be located.

    e. Stored address records are important evidence because they show the user's close associates and family members, and they contain names and nicknames connected to phone numbers that can be used to identify suspects.

## TECHNICAL TERMS

28. Based on my training and experience, and that of other more experienced law enforcement officers, I use the following technical terms to convey the following meanings:

    a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the SUBJECT DEVICE.

29. Based on my knowledge, training, and experience, and that of other more experienced law enforcement officers, I know that cellular telephones can store information referenced above for long periods of time. This information can sometimes be recovered with forensic tools.

30. *Forensic evidence.* As further described in ATTACHMENT B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the SUBJECT DEVICE was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the SUBJECT DEVICE because cellular telephones retain call logs, texts, and photographs in the memory of the cellular telephone. Similar to a computer or other digital device this information is retained in phone until it is written over.

31. *Manner of execution.* This warrant seeks authorization to seize and forensically examine SUBJECT DEVICE currently in the possession of law enforcement. Consequently, I request authorization to forensically examine the SUBJECT DEVICE at any time, day or night.

## DIGITAL DEVICES AS INSTRUMENTALITIES OF THE CRIMES

32. Based upon the evidence provided, it is reasonable to believe the SUBJECT DEVICE was utilized to further criminal activity by communications between TRUJILLO and her associates,

employers, and customers. Due to the manner in which the SUBJECT DEVICE was reportedly used to communicate and facilitate transactions between TRUJILLO and Monique Chavez, it is reasonable to believe the SUBJECT DEVICE were used as an instrumentality of the crimes under investigation.

## SEARCH TECHNIQUES

33. Based on the foregoing, and consistent with Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, the warrant I am applying for will permit imaging or otherwise copying all data contained on the SUBJECT DEVICE and will specifically authorize a review of the media or information consistent with the warrant.

34. In accordance with the information in this affidavit, law enforcement personnel will execute the search of the SUBJECT DEVICE pursuant to this warrant as follows:

### Securing the Data

35. In order to examine the SUBJECT DEVICE in a forensically sound manner, law enforcement personnel with appropriate expertise will attempt to produce a complete forensic image, if possible and appropriate, of the SUBJECT DEVICE.[1]

36. Law enforcement will only create an image of data physically present on or within the SUBJECT DEVICE. Creating an image of the SUBJECT DEVICE will not result in access to any data physically located elsewhere. However, the SUBJECT DEVICE that have previously connected to devices at other locations may contain data from those other locations.

### Searching the Forensic Images

37. Searching the forensic images for the items described in Attachment B may require a range of data analysis techniques. In some cases, it is possible for agents and analysts to conduct carefully targeted searches that can locate evidence without requiring a time-consuming manual search through unrelated materials that may be commingled with criminal evidence. In other cases, however, such techniques may not yield the evidence described in the warrant, and law enforcement may need to conduct more extensive searches to locate evidence that falls within the scope of the warrant. The search techniques that will be used will be only those methodologies, techniques and protocols as may reasonably be expected to find, identify, segregate and/or duplicate the items authorized to be seized pursuant to Attachment B to this affidavit.

---

[1] The purpose of using specially trained computer forensic examiners to conduct the imaging of digital devices or other electronic storage media is to ensure the integrity of the evidence and to follow proper, forensically sound, scientific procedures. When the investigative agent is a trained computer forensic examiner, it is not always necessary to separate these duties. Computer forensic examiners often work closely with investigative personnel to assist investigators in their search for digital evidence. Computer forensic examiners are needed because they generally have technological expertise that investigative agents do not possess. Computer forensic examiners, however, often lack the factual and investigative expertise that an investigative agent may possess on any given case. Therefore, it is often important that computer forensic examiners and investigative personnel work closely together.

**Good Cause for Executing Warrant Anytime Day or Night**

38. Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Furthermore, forensic examinations and extractions of wireless telephones may require a significant amount of time to complete, sometimes spanning the course of months. Consequently, I submit there is good cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

39. Based on the foregoing, I respectfully submit that probable cause exists to search the SUBJECT DEVICES described in ATTACHMENT A, for evidence, fruits, and instrumentalities of 18 USC § 922(a)(1)(A): Dealing in Firearms Without a License; 18 USC § 922(a)(6) – Knowingly Making False Statements in Connection with the Purchase of a Firearm; as described in ATTACHMENT B.

Respectfully submitted,

_____
Brenton Hutson, Special Agent
Bureau of Alcohol, Tobacco, Firearms and Explosives

Electronically submitted and telephonically sworn, this 9th day of March 2022

_____
THE HONORABLE John F. Robbenhaar
United States Magistrate Judge

## ATTACHMENT A

### Places to Be Searched - Subject Device

**A.)** SUBJECT DEVICE: The SUBJECT DEVICE is further described as a black Motorola cellular telephone with a cracked screen and a Verizon logo visible on the back, recovered from TRUJILLO on March 5, 2022. Further identified in the photographs copied below, which were taken at the ATF Albuquerque Field Office on March 5, 2022:




## ATTACHMENT B

### Evidence to be Seized

1. All records limited to the timeframe between October 1, 2019 and March 5, 2022 on the SUBJECT DEVICE which constitute evidence, fruits, and instrumentalities of 18 USC § 922(a)(1)(A): Dealing in Firearms Without a License; 18 USC § 922(a)(6) – Knowingly Making False Statements in Connection with the Purchase of a Firearm, to include:

   a. Information related to any firearm used during the course of the crimes listed above, including the identities of who owned, possessed, and used the firearms during the course of the crimes;
   b. Any communication with or among co-conspirators, suppliers, or customers related to the crimes listed above;
   c. Any information relating to the planned distribution or planned use of the proceeds of the crimes listed above;
   d. Any subscriber information or contact information to include, names, addresses, telephone numbers, email addresses or other identifiers;
   e. Any call log information, including missed, incoming and outgoing calls and any information associated with those numbers;
   f. Any photographs, video and audio files related to the crimes listed above;
   g. Any text messages, email messages, chats, multimedia messages, installed applications or other electronic communications related to the crimes listed above;
   h. Any documents, spreadsheets, calendar, note, password, dictionary or database entries related to the crimes listed above;
   i. Any business records, to include ledgers, receipts, invoices, shipping documents, inventories, customer lists, bank account information, accounting or business software, customer communications, email communications, website or Social Media sites used for the business, and other business records and information reasonably related to the operation of an illicit business related to the crimes above.
   j. Any internet or browser entries or history; and
   k. Any system data, location information data, or configuration information contained within the SUBJECT DEVICE.

2. Any other user or system files and data, contained on the subject device itself or an attached peripheral device such as a sim card or micro SD card, which would constitute evidence of violations described above.

3. Evidence of user attribution showing who used or owned the SUBJECT DEVICE at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history; As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) any photographic or video format, and any content within smartphone applications such as WhatsApp, Snapchat, Marco Polo, Facebook and others that are stored on the devices.